FILED
JAMES J. WALDRON, CLERK
APR 29 2016
U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY_____ DEPUTY

**NOT FOR PUBLICATION**

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
| In Re: <br><br> Star Group Communications, Inc., <br><br> Debtor. | Case No.: 15-25543-ABA <br><br> Adv. No.: 15-02497-ABA |
| Thomas J. Subranni, <br> Plaintiff <br><br> v. <br><br> Navajo Times Publishing Company, Inc., <br> Defendant. | Chapter: 7 <br><br> Judge: Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

Before the court is a Motion to Dismiss Adversary Proceeding by Defendant, Navajo Times Publishing Company, Inc. (hereinafter "Navajo Times"), under Rule 12(b)(1) and (b)(6) asserting tribal sovereign immunity. Chapter 7 Trustee, Thomas J. Subranni, (hereinafter "Trustee") commenced this Adversary Proceeding to avoid and recover preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code. For the reasons that follow, the court finds that Navajo Times is a subordinate economic entity which enables it to enjoy the benefits of sovereign immunity. Thus, Navajo Times' Motion to Dismiss is granted.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), and (F), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court.

## PROCEDURAL HISTORY

On August 17, 2015 creditors of Star Group Communications Inc. Media & Marketing Group (hereinafter "Debtor") filed an involuntary chapter 7 petition. (Case No. 15-25543-ABA). On September 10, 2015 (*nunc pro tunc*) the court entered relief against Debtor. On September 17, 2015, Trustee was appointed interim trustee of Debtor's estate. On December 7, 2015, Trustee filed an Adversary Complaint against Navajo Times, which seeks to avoid and recover

preferential transfers pursuant to sections 547[1] and 550[2]. (Adv. No. 15-02497-ABA; Doc. 1). On January 25, 2016, Navajo Times filed a Motion to Dismiss Adversary Proceeding pursuant to Rule 12(b)(1) and (b)(6) ("Motion") on the grounds that "Navajo Times is an entity of the Navajo Nation, a federally recognized Indian tribe, who has not waived its Sovereign Immunity." (Doc. 4-1, at 4). On February 5, 2016, Trustee filed a Memorandum of Law in Opposition to [Navajo Times'] Motion to Dismiss. (Doc. 8). On February 10, 2016, Navajo Times filed a Reply in Support of Motion to Dismiss. (Doc. 10).

The matter was set down for hearing on February 16, 2016. At that hearing, the court preliminarily ruled that section 106 of the Bankruptcy Code does not abrogate sovereign immunity for Indian tribes and in this case, the Navajo Nation. Nevertheless, at the conclusion of the hearing, the court ordered post-hearing submissions addressing whether Navajo Times is a "subordinate economic entity"[3] likewise protecting it from Trustee's suit.

On March 22, 2016, Navajo Times filed a Supplemental Memorandum of Law in Support of Motion to Dismiss. (Doc. 11). On April 8, 2016, Trustee filed a Reply Brief of Plaintiff Thomas J. Subranni, as Chapter 7 Trustee, in Opposition to Memorandum of Law of Defendant Navajo Times Publishing Company, Inc. in Support of Motion to Dismiss Complaint. (Doc. 12). Following the receipt of the parties' post-hearing submissions, the court took this matter under advisement. This matter is now ripe for disposition.

## FINDINGS OF FACT

The pertinent undisputed facts to this Motion are as follows:

Navajo Times is a "regional publishing company providing a weekly publication and other media." (Doc. 4-2, Ex. C, Articles of Incorporation). On March 11, 1997, the Navajo Nation Council directed that the Navajo Times Program within the Division of Economic Development be "privatized." (Doc. 4-2, Ex. B, Resolution of the Economic Development Committee (hereinafter the "EDC Resolution"), at 10, ¶4). The word "privatize", as used in the Directive, meant to establish as a separate, tribally owned business. (*Id.*). On October 21, 2001, the Navajo Times entered into a consulting contract to begin the formal process to establish the Navajo Times as a separate, tribally owned corporation. (*Id.*). Upon completion of this process the Navajo Times was ready to begin operations as a "corporation organized under the Navajo Nation Corporation Code." (*Id.*). On September 24, 2003, the Economic Development

---

[1] "In general, a 'preference' exists when a debtor makes payment or other transfer to a certain creditor or creditors [within 90 days of the bankruptcy filing], and not to others. 4 L. King, Collier on Bankruptcy § 547.01 (15th ed. 1985). Such favoritism is prohibited by 11 U.S.C. § 547(b) when a debtor is in bankruptcy [and the debtor in possession or trustee may void and set aside the transfer]." *In re George Rodman, Inc.*, 792 F.2d 125, 127 (10th Cir. 1986).

[2] "Section 550 of the Bankruptcy Code permits a trustee or a (debtor in possession) after the avoidance of a transfer . . . to recover the property transferred or the value of the property transferred." 5 Collier on Bankruptcy ¶ 550.01, at 550-53 (16th ed.).

[3] Pursuant to the test enumerated in *Uniband, Inc. v. C.I.R.*, 140 T.C. 230 (2013).

Committee of the Navajo Nation Council approved Resolution EDCS-75-03 recommending the incorporation of the Navajo Times Program within the Division of Economic Development as a "wholly owned corporation of the Navajo Nation, to be governed by the Articles of Incorporation and Bylaws," recommending the transfer of Navajo Times assets and liabilities into the new corporation, and approving the appropriation of $500,000.00 from the Navajo Nation Business and Industrial Development Fund to be contributed to the Navajo Times as an equity investment. (EDC Resolution, at 12, ¶¶1.a, 1.b, and 2).

> On October 23, 2003, the Navajo Nation Counsel approved Resolution CO-68-03:
>
> Approving the Incorporation of the "Navajo Times Publishing Company, Inc." as a Wholly Owned Corporation of the Navajo Nation; Approving the Articles of Incorporation and Bylaws of Such Corporation; Approving the Transfer to Such Corporation All Assets, Liabilities, Contributed Capital, Current Fiscal Year Revenues and Expenses, and All Prior Fiscal Year Carryovers of Excess Revenues Presently on the Books and Records of the Navajo Nation

(Doc. 4-2, Ex. A, Resolution of the Navajo Nation Counsel (hereinafter the "Navajo Nation Resolution"), at 4). The Navajo Nation Resolution considered the recommendation of the EDC that:

> . . . the reorganization of the Navajo Times Program into a for-profit corporation, to be governed by the Articles of Incorporation and Bylaws, . . . and to be named "Navajo Times Publishing Company, Inc." to be wholly owned by, but independent of the political control or influence of the Navajo Nation. It is concluded that the management and staff of the Navajo Times have demonstrated that they can operate a successful business and provide a quality newspaper serving the Navajo Nation and surrounding communities, and that such corporation, if freed from the construction of a governmental program, will flourish, grow and return dividends to the Navajo Nation; and . . . The Navajo Nation Council has carefully considered the above recommendations and has determined that the recommendations are sound.

(*Id.* at 5-6, ¶¶8, 9).

On November 20, 2003, the Articles of Incorporation was signed by the Incorporator, Tom Arviso, Jr. (Doc. 4-2, Ex. C, Articles of Incorporation, at 15). Currently, Mr. Arviso is the C.E.O. and Publisher of the Navajo Times. (Doc. 11-1, Affidavit of Tom Arviso, Jr. in Support of Motion to Dismiss (hereinafter "Arviso Affidavit"), at 2, ¶1). The Articles of Incorporation provide, in pertinent part, that:

**ARTICLE III. - Corporate Purposes.**

The Corporation is organized to pursue the following purposes for the benefit of the shareholders, the community and the employees:

A. To own and operate, directly or indirectly through the establishment of subsidiary operations, joint ventures, partnerships or other business arrangements, a publishing company providing news/media in both print and electronic media, as well as other commercial printing and publication services that serve the interests of the community;

B. To create a commerce-friendly environment that provides the most effective means of conducting business with customers, vendors, service providers, financial institutions, regulatory authorities, and other business operations;

C. To conduct activities in all aspects of the media/publishing industry either within or outside of the Navajo Nation;

D. To engage in any lawful business with the powers permitted to a corporation organized pursuant to the Navajo Nation Corporation Code, as amended.

(Doc. 4-2, Ex. C, Articles of Incorporation, at 14).

**ARTICLE V. Ownership of Corporation.**

. . .

The Navajo Nation for its benefit and its enrolled members shall own all shares in the Corporation. No individual or legal entity other than the Navajo Nation shall acquire any shares in the Corporation and its interest may not be sold, transferred, pledged, or hypothecated, either voluntarily or involuntarily.

(Doc. 4-2, Ex. C, Articles of Incorporation, at 15).

The Bylaws provide, in pertinent part, that:

**Section 1.01. Shareholder Representatives.** Pursuant to the Incorporation, the Navajo Nation owns all shares in the Corporation. As the sole shareholder, the Navajo Nation's shares in the Corporation shall be exercised by eleven (11) "shareholder representatives," composed of one member from each of the eleven (11) standing committees of the Navajo Nation Council or their successor committees, in accordance with these By-laws and applicable tribal laws. Each standing committee shall select a shareholder representative. At all meetings of the shareholders, these shareholder representatives shall, in all instances, subordinate their personal interests to those of the Corporation in acting in their capacity as representatives of the sole shareholder and not as members of the Navajo Nation Council.

(Doc. 4-2, Ex. D, Bylaws, at 16).

**Section 10.01. Claims Against the Corporation.** *The Corporation is an instrumentality of the Navajo Nation and is entitled to all of the privileges and immunities of the Navajo Nation, except as provided in this Article.* The Corporation and its directors, officers, employees and agents while acting in their

> official capacities are immune from suit, and the assets and other property of the Corporation are exempt from any levy or execution, provided that, notwithstanding any other provision of law, including but not limited to the Navajo Sovereign Immunity Act, 1 N.N.C. §551, et seq., **the Board of Directors may waive the defenses identified in this Article, in conformity with the procedures established in this Article, in order to further the purposes of the Corporation. Any waiver of the defenses identified in this Article must be expressed and must be agreed to by the Board of Directors prior to the time any alleged cause of action accrues.**
>
> . . .
>
> Any waiver by the Corporation authorized by the above paragraphs of this Article shall be in the form of a resolution duly adopted by the Board of Directors upon thirty (30) days written notice to the Speaker of the Navajo Nation Council of the Board's intention to adopt the resolution. The resolution shall identify the party or parties for whose benefit the waiver is granted, the agreement or transaction and the claims or classes of claims for which the waiver is granted, the property of the Corporation which may be subject to execution to satisfy any judgment which may be entered in the claim, and shall identify the court or courts in which suit against the Corporation may be brought. Any waiver shall be limited to claims arising from the acts or omission of the Corporation, its directors, officers, employees or agents, and shall be construed only to affect the property and income of the Corporation.

(*Id.* at 24) (emphasis added). Additionally, the Bylaws provide that the Directors "shall consist of professionals within the publishing industry and individuals with substantial experience in positions of responsibility in business or related academia." (*Id.* at 17). Finally, pursuant to the Bylaws, "[t]he Navajo Nation shall have no authority to direct the business affairs of the Corporation, except through its status as the sole shareholder of the corporation and as provided in these By-laws." (*Id.* at 18).

## DISCUSSION

### A.   Motion to Dismiss Standard under Rule 12(b)(1) and 12(b)(6)

Navajo Times moves to dismiss the Complaint in the Adversary Proceeding under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief may be granted. A motion to dismiss on the basis of sovereign immunity tests the court's subject matter jurisdiction to entertain the action. *In re Greektown Holdings, LLC*, 532 B.R. 680, 685 (E.D. Mich. 2015) (applying Rule 12(b)(1) subject matter jurisdiction standard to tribal immunity dispute). *See also FDIC v. Meyer*, 510 U.S. 471, 475 (1996) ("[s]overeign immunity is jurisdictional in nature"); *Lewis v. Norton*, 424 F.3d 959, 961 (9th Cir. 2005) (courts lack subject matter jurisdiction to determine claims barred by tribal sovereign immunity); *E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1302-03 (10th Cir. 2001) ("Tribal sovereign

immunity is a matter of subject matter jurisdiction, which may be challenged by a motion to dismiss under [Rule] 12(b)(1)").

In *Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d 884 (3d Cir. 1977), the Third Circuit for the United States Court of Appeals divided Rule 12(b)(1) motions into two categories: facial and factual. *Id.* at 891. A facial attack on jurisdiction is directed to the sufficiency of the pleading as a basis for subject matter jurisdiction. "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the Plaintiff." *Gould Electronics, Inc. v. United States,* 220 F.3d 169, 176 (3d Cir. 2000). In a factual attack on jurisdiction under 12(b)(1), however, the movant calls into question the essential facts underlying a claim of subject matter jurisdiction. "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction[,] its very power to hear the case[,] . . . the trial court is free to weight the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen* 549 F.2d at 891; *see also Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62, 69 (3d Cir. 2000). Under this standard, no presumptive truthfulness attaches to plaintiff's allegations of jurisdictional facts. *Robinson v. Dalton,* 107 F.3d 1018, 1021 (3d Cir. 1997) (citing *Mortensen,* 549 F.2d at 891). Therefore, in a 12(b)(1) factual challenge, a court may consult material outside the pleadings, and the burden of proving jurisdiction lies with the plaintiff. *Gould Electronics,* 220 F.3d at 178. "In general, when a Rule 12(b)(1) motion is supported by a sworn statement of facts, the court should treat the Defendant's challenge as a factual attack on jurisdiction." *Med. Soc'y of N.J. v. Herr,* 191 F.Supp.2d 574, 578 (D.N.J. 2002) (citing *Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines,* 673 F.2d 700, 711 (3d Cir. 1982)).

Navajo Times also moves to dismiss the Complaint under Rule 12(b)(6). Rule 12(b)(6) permits a party to seek dismissal of a complaint for failure to state a claim upon which relief may be granted. Navajo Times' assertion of tribal sovereign immunity is jurisdictional in nature, thus the court will proceed under the Rule 12(b)(1) motion to dismiss standard. *See Rovinsky v. Choctaw Mfg. & Dev. Corp.,* No. CIV. A. 09-0324(GEB), 2009 WL 3763989 (D.N.J. Nov. 10, 2009) (applying Rule 12(b)(1) standard to subordinate economic entity analysis).

### B.    Section 106 does not abrogate sovereign immunity for Indian tribes

At the hearing on February 16, 2016, the court preliminarily ruled that section 106(a) of the Bankruptcy Code does not abrogate sovereign immunity for Indian tribes for the following reasons:

The court agrees with the reasoning in *In re Whitaker,* 474 B.R. 687 (B.A.P. 8th Cir. 2012) (finding that Congress did not unequivocally express its intent to abrogate sovereign immunity of Indian tribes under section 106(a)). Indian tribes have long been recognized as possessing common law immunity from suit traditionally enjoyed by sovereign powers. *Id.* (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 (1978)). The doctrine of tribal sovereign immunity is a matter of common law, which has been recognized as integral to the sovereignty and self-governance of tribes. *Id.* (citing *Santa Clara Pueblo,* 436 U.S. at 58). Abrogation by Congress of sovereign immunity "cannot be implied," but must be "unequivocally expressed" in

"explicit legislation."[4] *Id.* (citing *Santa Clara Pueblo*, 436 U.S. at 58; *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 758 (1998)).

In bankruptcy cases, Congress's abrogation of sovereign immunity is found in section 106(a) of the Bankruptcy Code. Section 106(a) provides, relevant part, that:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a *governmental unit* to the extent set forth in this section with respect to . . .
>     (1) [Several enumerated sections of the Bankruptcy Code, including sections 547 and 550 relating to avoidance and recovery of preferential transfers.]
>     (2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

11 U.S.C. § 106(a) (emphasis added). The statute does not mention "Indian tribes" specifically, but instead abrogates immunity as to "governmental units," which are defined in section 101(27) as:

> (27) The term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(27).

In *Whitaker*, the court held that Congress did not unequivocally express its intent to abrogate sovereign immunity of Indian tribes by enacting provision of the Bankruptcy Code that abrogated sovereign immunity of "governmental units," and by defining "governmental unit" as "the United States, State, Commonwealth, District, Territory, municipality . . . or other foreign or domestic government." 474 B.R. at 695. The *Whitaker* court concluded that Indian tribes could not be the subject of avoidance and turnover actions by chapter 7 trustees because Indian tribes were not clearly and unequivocally included in terms "other foreign or domestic governments." *Id. See also In re Greektown Holdings, LLC*, 532 B.R. 680 (E.D. Mich. 2015) (finding that Congress did not unequivocally express its intent to abrogate sovereign immunity of Indian

---

[4] The court is not convinced that the Navajo Nation Resolution is in and of itself a waiver of tribal sovereign immunity as to Navajo Times. The Navajo Nation Resolution was approved on October 23, 2003. (Doc. 4-2, Ex. A, Navajo Nation Resolution, at 7). After that, on November 20, 2003, the Articles of Incorporation (and assumedly the Bylaws) were entered. (Doc. 4-2, Ex. C, Articles of Incorporation, at 15). The Bylaws specifically state that Navajo Times enjoys the privilege of tribal sovereign immunity and sets out the procedure for a voluntary waiver. (Doc. 4-2, Ex. D, Bylaws, at 24). *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010) (finding that tribe clearly intended for its Economic Development Authority and Casino to be subordinate economic entities which shared in tribe's sovereign immunity because ordinance governing Authority stated it was empowered to "waive Authority's sovereign immunity from suit [or] to consent to the jurisdiction of any court over the Tribe.")

tribes under section 106(a), such that Indian tribe could not be the subject of strong-arm proceeding brought by litigation trustee to avoid allegedly fraudulent transfers). Furthermore, where the language of a federal statute does not include "Indian tribes" in definitions of parties subject to suit or does not specifically assert jurisdiction over "Indian tribes," courts find the statute insufficient to express an unequivocal congressional abrogation of tribal sovereign immunity. *Greektown Holdings, LLC*, 532 B.R. at 694 (citing *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 357-58 (2d Cir. 2000) (holding Indian tribe immune from suit under the Copyright Act); *Florida Paraplegic, Ass'n, Inc. v. Miccosukee Tribe of Indians of Florida*, 166 F.3d 1126, 1131 (11th Cir. 1999) (stating that because Congress made no specific reference to Tribes anywhere in the ADA, tribal immunity is not abrogated; suit under ADA dismissed)).

"The Trustee respectfully disagrees with the Court's preliminary holding that § 106 does not abrogate the sovereign immunity of Indian tribes to the extent such holding is inconsistent with the decision of the Ninth Circuit Court of Appeals in *Krystal Energy Company v. Navajo Nation*, 357 F.3d 1065 (9th Cir. 2004), holding that Indian tribes are indeed 'governmental units' within the meaning of § 106." (Doc. 12, at 2 n.1). In *Whitaker*, the Eighth Circuit Bankruptcy Appellate Panel expressly rejected the Ninth Circuit's reasoning in *Krystal*, and held that absent a specific mention of "Indian tribes" in the Bankruptcy Code, any finding of abrogation under section 106(a) necessarily must rely on inference or implication, both of which are prohibited by Supreme Court precedent. 474 B.R. at 693-94. Finding *Krystal* unpersuasive given its failure to cite one case where tribal immunity was found to have been abrogated in the absence of a specific mention of the words "Indian tribes," and deriding the Ninth Circuit's failure to adhere to the clear proscription against inference and implication in finding such abrogation, the *Whitaker* Bankruptcy Appellate Panel refused to follow *Krystal*—so too does this court. *Id.* at 695.

The Tenth Circuit Bankruptcy Appellate Panel suggested the same conclusion in *In re Mayes*, 294 B.R. 145 (B.A.P. 10th Cir. 2003). Although not a basis for the holding in *Mayes*, the panel noted that section 106(a) probably could not be interpreted as an unequivocal expression of congressional intent to abrogate tribal sovereign immunity:

> Section 101(27) does not refer to Indian nations or tribes. The only portion of that section that could be said to apply to an Indian nation or tribe is its reference to a "domestic government." While several bankruptcy courts have either expressly or impliedly held that Indian nations or tribes are "domestic governments" to which §§ 101(27) and 106 apply, *see Warfield v. Navajo Nation (In re Davis Chevrolet, Inc.)*, 282 B.R. 674, 678 n.2 (Bankr. D. Ariz. 2002); *Turning Stone Casino v. Vianese (In re Vianese)*, 195 B.R. 572, 575-76 (Bankr. N.D.N.Y. 1995); *In re Sandmar Corp.*, 12 B.R. 910, 916 (Bankr. D.N.M. 1981), we conclude that they probably are not. Accordingly, § 106(a) likely could not abrogate Appellee's immunity even if it were constitutional. *See In re National Cattle Congress*, 247 B.R. 259, 266-67 (Bankr. N.D. Iowa 2000). Our conclusion comports with the general proposition that Congress must make its intent to abrogate an Indian nation's immunity clear and unequivocal, and actions against tribes cannot merely be implied. *See, e.g., Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58-59 (1978).

294 B.R. at 148 n. 10.

As the court previously addressed at the February 16, 2016 hearing, it must adhere to the basic canons of statutory interpretation by following the plain language of section 106. As the Third Circuit noted in *City of Philadelphia v. Nam (In re Gi Nam)*, "[f]ollowing the teaching of the Supreme Court, we have held that the 'starting point of any statutory analysis is the language of the statute itself.'" 273 F.3d 281, 286 (3d Cir. 2001). The inquiry ends if the statutory language is unambiguous and the statutory scheme is coherent and consistent. *Id.* The plain language of the statute, section 106(a), is clear and unambiguous. It does not abrogate sovereign immunity for Indian tribes.

> Statutes are to be construed and applied in accordance with the plain meaning of the words used by Congress. It is not for the court to ignore what the statute actually says, or to employ strained or imaginative interpretations not consistent with the plain and ordinary usage and meaning of the statutory language. The intent of Congress must be presumed to comport with the plain and ordinary meaning of the words in the statute as Congress wrote it, and it is not for the court to substitute its judgment in the guise of divining Congressional intent through creative "construction."

*In re Delta Air Lines*, 341 B.R. 439, 445 (Bankr. S.D.N.Y. 2006).[5] *See also, In re Mortimore*, 2011 WL 6717680 (D.N.J. Dec. 21, 2011). If Congress had intended to abrogate sovereign immunity to Indian tribes under section 106, it could easily and expressly have done so, but it did not.

### C.    Navajo Times is entitled to tribal sovereign immunity

Tribal sovereign immunity can extend to both business and governmental activities of the tribe. *Uniband, Inc. v. C.I.R.*, 140 T.C. 230, 250 (2013) (citing *Kiowa Tribe of Ok. v. Manufacturing Technologies, Inc.* 523 U.S. 751 (1989)). "A subdivision of tribal government or a corporation attached to a tribe may be so closely allied with and dependent upon the tribe that it is effectively an arm of the tribe. It is then actually a part of the tribe per se, and, thus, clothed with tribal immunity." *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 439 (Alaska 2004). In determining whether a corporation was an "arm of the tribe" entitled to tribal sovereign immunity, the court in *Uniband* considered that the corporation's "purposes may or may not promote the general welfare of [tribe's] members, and since it may or may not be managed and controlled by [ ] tribal representatives, [ ] conclude it fails to be an 'arm' of [tribe]." 140 T.C. at 252. The certificate of incorporation of the corporation in *Uniband* stated that its purpose was simply to engage in "any lawful act or activity"—not just activities that "promote economic development." *Id.* By contrast, here Navajo Times "Corporate Purposes" include for the "benefit of the shareholders, the community and the employees: [t]o own and

---

[5] Even if the court could employ its own interpretation, it is compelled by the *Whitaker* court's analysis finding no mention of Indian tribes in the legislative history of the applicable statutes and the reluctance by the various courts to refer to Indian tribes as "governments". *See Whitaker*, 474 B.R. at 691-95. This makes it impossible to extend application of the statute, even if the court could, beyond its plain and unambiguous language.

operate . . . a publishing company providing news/media in both print and electronic media, as well as other commercial printing and publication services that *serve the interests of the community* [and] [t]o conduct activities in all aspects of the media/publishing industry *either within or outside of the Navajo Nation*." (Doc. 4-2, Ex. C, Articles of Incorporation, at 14) (emphasis added). The court accepts that the service Navajo Times provides promotes the general welfare and serves the interests of the tribal community.

In its "arm of the tribe" analysis, the *Uniband* court also noted that there was "nothing in its corporate charter or bylaws to ensure that [corporation's] governing body is composed of [ ] tribal representatives." *Uniband*, 140 T.C. at 252. Similarly, here the Directors of Navajo Times do not appear to be limited to Navajo Nation members and "shall consist of professionals within the publishing industry and individuals with substantial experience in positions of responsibility in business or related academia." (Doc. 4-2, Ex. D, Bylaws, at 17). Furthermore, Navajo Times' Bylaws provide that "[t]he Navajo Nation shall have no authority to direct the business affairs of the Corporation; except through its status as the sole shareholder of the corporation and as provided in these By-laws." (*Id.* at 18). With these considerations alone, the court cannot conclude whether Navajo Times is an "arm of the tribe" entitled to tribal sovereign immunity; however, the court's inquiry does not end here.

Another factor that distinguishes an organization entitled to tribal sovereign immunity (as opposed to a mere business interest of a tribe) is that the tribal council establishes the organization pursuant to its powers of self-government. *Uniband*, 140 T.C. at 252. *See also Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581, 583 (8th Cir. 1998) (concluding that a housing authority "established by a tribal council pursuant to its powers of self-government" is a tribal agency entitled to tribal sovereign immunity). The *Uniband* court concluded that the corporation at issue was not a tribal establishment because it was chartered not by the tribe but by the State of Delaware and at its inception was only partially owned by the tribe. *Uniband*, 140 T.C. at 252-53. Conversely, here Navajo Times is "organized pursuant to the Navajo Nation Corporation Code," and "[t]he Navajo Nation for its benefit and its enrolled members shall own all shares in the Corporation," and "[n]o individual or legal entity other than the Navajo Nation shall acquire any shares in the Corporation and its interest may not be sold, transferred, pledged, or hypothecated, either voluntarily or involuntarily." (Doc. 4-2, Ex. C, Articles of Incorporation, at 14, 15). In addition, "[t]he Trustee acknowledges that [Navajo Times] is owned by the Navajo Nation." (Doc. 12, at 8 ¶23). For these reasons, the court concludes that Navajo Times is a "tribal establishment" but this factor alone is not dispositive to the inquiry.[6] The court must also review the "subordinate economic entity" factors considered by many other courts.

As the district court in the Western District of Oklahoma commented, "[a]lthough the subordinate economic entity analysis has been widely adopted, its implementation is rarely uniform." *Somerlott v. Cherokee Nation Distributors Inc.*, No. CIV-08-429-D, 2010 WL 1541574, at *3 (W.D. Okla. Apr. 16, 2010), *aff'd*, 686 F.3d 1144 (10th Cir. 2012).; *see also*

---

[6] "The entities to which a subordinate economic entity test has traditionally been applied . . . have all been organized, in some form or another, under tribal law." *Somerlott*, 2010 WL 1541574, at *3. "Although immunity extends to entities that are *arms of the tribes*, it apparently does not cover tribally chartered corporations that are completely independent of the tribe." *Id.* (citing F. Cohen, *Handbook of Federal Indian Law*, § 7.05(1)(a), p. 636 (2005 ed.) (emphasis added)).

*Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1188 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 293 (Minn. 1996)) ("the demarcation between those business entities so closely related to tribal governmental interests as to benefit from the tribe's sovereign immunity and those so far removed as to be treated as mere commercial enterprises is not as clear. . . . whether tribal sovereign immunity now extends to commercial activities is an important, complex and unresolved question, which the U.S. Supreme Court has never directly considered."). Accordingly, we have looked to the various tests used by courts[7] and have employed the *Johnson* factors, which the court believes to be most helpful in this particular instance. *Johnson v. Harrah's Kansas Casino Corp.*, No. 04-4142-JAR, 2006 WL 463138, at *4 (D. Kan. Feb. 23, 2006). When determining whether tribal sovereign immunity is possessed by a tribal business, which, if so, is sometimes referred to as a "subordinate economic entity," courts have considered some or all of the following factors:

> (1) the announced purpose for which the entity was formed; [2] whether the entity was formed to manage or exploit specific tribal resources; (3) whether federal policy designed to protect Indian assets and tribal cultural autonomy is furthered by the extension of sovereign immunity to the entity; (4) whether the entity is organized under the tribe's laws or constitution rather than federal law; (5) whether the entity's purposes are similar to or serve those of the tribal government; (6) whether the entity's governing body is comprised mainly of tribal officials; (7) whether the tribe has legal title or ownership of property used by the entity; (8) whether tribal officials exercise control over the administration or accounting activities of the organization; (9) whether the tribe's governing body has power to dismiss members of the organization's governing body, and (10) whether the entity generates its own revenue, whether a suit against the entity would impact the tribe's fiscal resources, and whether it may bind or obligate tribal funds.

*Uniband*, 140 T.C. at 253-54 (citing *Johnson*, 2006 WL 463138, at *4).

---

[7] *See, e.g., Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010) ("we conclude that the following factors are helpful in informing our inquiry: (1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; [ ] (5) the financial relationship between the tribe and the entities; [and (6)] the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities."); *In re Whitaker*, 474 B.R. 687, 697 (B.A.P. 8th Cir. 2012) (same); *Am. Prop. Mgmt. Corp. v. Superior Court*, 206 Cal. App. 4th 491, 501, 141 Cal. Rptr. 3d 802, 809 (2012) (same); *Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099, 1110 (Colo. 2010) ("Accordingly, we . . . identify three factors, each of which focuses on the relationship between the tribal entities and the tribes, to help guide the trial court's determination whether the entities in this case act as arms of the tribes so that their activities are properly deemed to be those of the tribes: (1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty. We believe this arm-of-the-tribe analysis is consistent with governing federal law and is not likely to function as a state diminution of tribal sovereign immunity.").

<u>The court will first address factors 1, 2, 3, and 5 together, as all relate to Navajo Times' purpose and the promotion of tribal autonomy</u>:

> (1) the announced purpose for which the entity was formed;
> (2) whether the entity was formed to manage or exploit specific tribal resources;
> (3) whether federal policy designed to protect Indian assets and tribal cultural autonomy is furthered by the extension of sovereign immunity to the entity; and
> (5) whether the entity's purposes are similar to or serve those of the tribal government.

*Uniband*, 140 T.C. at 253-54 (citing *Johnson*, 2006 WL 463138, at *4).

In *Allen v. Gold Country Casino*, the Court of Appeals for the Ninth Circuit held that a tribe's casino was "no ordinary business" and was entitled to tribal immunity because the casino's "creation was dependent upon [tribal] government approval at numerous levels", and the Federal statute under which the casino was created intended that creation and operation of Indian casinos promote "tribal economic development, self-sufficiency, and strong tribal governments." 464 F.3d 1044, 1046-47 (9th Cir. 2006). *See also Gavle v. Little Six, Inc.*, 555 N.W.2d at 294 (finding that courts should determine "whether federal policies intended to promote Indian tribal autonomy are furthered by the extension of immunity to the business entity"); *Ransom v. St. Regis Mohawk Educ. & Cmty. Fund, Inc.*, 86 N.Y.2d 553, 560, 658 N.E.2d 989, 993 (1995) (nonprofit corporation created by tribe was entitled to sovereign immunity in part because the corporation was established to "enhance the health, education and welfare of Tribe members, a function traditionally shouldered by tribal government."); *J.L. Ward Associates, Inc. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163, 1176 (D.S.D. 2012) (citing Patrice H. Kunesh, *Tribal Self–Determination in the Age of Scarcity*, 54 S.D. L. Rev. 398, 402 (2009)) ("When a tribe establishes an entity to conduct certain activities, such as housing authorities, health agencies, educational institutions, cultural centers, and corporate gaming operations, the entity is immune from suit if it functions as an arm of the tribal government.").

In *Uniband*, the court rejected the corporation's assertion that it promoted tribal autonomy because "[w]hile [corporation] appears to have employed [tribe] members to perform its data entry services, it has not shown the extent of its employment of [tribe] members nor demonstrated that it was established to promote [tribe's] economic development, as opposed to simply generating revenue" and "[corporation's] creation did not depend only on [tribe's] approval." *Uniband*, 140 T.C. at 255. Whereas, here Navajo Times was created by the approval of the Navajo Nation Resolution to be "wholly owned by, but independent of the political control or influence of [t]he Navajo Nation . . . to provide a quality newspaper serving the Navajo Nation and surrounding communities." (Doc. 4-2, Ex. A, Navajo Nation Resolution, at 5 ¶8). Navajo Times "Corporate Purposes" are for the "benefit of the shareholders, the community and the employees: [t]o own and operate . . . a publishing company providing news/media in both print and electronic media, as well as other commercial printing and publication services that *serve the interests of the community* [and] [t]o conduct activities in all aspects of the media/publishing

industry *either within or outside of the Navajo Nation*."[8] (Doc. 4-2, Ex. C, Articles of Incorporation, at 14) (emphasis added). Furthermore, Navajo Times claims that it is "the primary source for news and information for the Navajo people. Its physical circulation is approximately 21,000; and it has over 200,000 followers online." (Doc. 11-1, Arviso Affidavit, at 2 ¶5). The court is satisfied that Navajo Times was established with the purpose of serving the Navajo community by providing an impartial quality newspaper, free from Navajo government influence. Additionally, the court is persuaded that the Navajo Times newspaper, which specifically caters to "the interests of the community," promotes the tribal autonomy of Navajo Nation.

> Next, the court will consider factors 4, 6, 7, 8, and 9, as they all relate to tribal control:
>
> (4) whether the entity is organized under the tribe's laws or constitution rather than federal law;
> (6) whether the entity's governing body is comprised mainly of tribal officials;
> (7) whether the tribe has legal title or ownership of property used by the entity;
> (8) whether tribal officials exercise control over the administration or accounting activities of the organization; and
> (9) whether the tribe's governing body has power to dismiss members of the organization's governing body.

*Uniband*, 140 T.C. at 253-54 (citing *Johnson*, 2006 WL 463138, at *4).

As previously established, Navajo Times is "organized pursuant to the Navajo Nation Corporation Code." (Doc. 4-2, Ex. C, Articles of Incorporation, at 14). Although there is no evidence as to whether Navajo Times' governing body is comprised mainly of tribal officials, the Bylaws provide that "[a]s the sole shareholder, the Navajo Nation's shares in the Corporation shall be exercised by eleven (11) "shareholder representatives," composed of one member from each of the eleven (11) standing committees of the Navajo Nation Council . . . " and the "Directors shall be elected at the annual meeting of the shareholder representatives . . . " (Doc. 4-2, Ex. D, Bylaws, at 16, 17). However, the Directors of Navajo Times are not limited to Navajo Nation members and "shall consist of professionals within the publishing industry and individuals with substantial experience in positions of responsibility in business or related academia."[9] (*Id.* at 17). Navajo Nation does not hold title or ownership of property used by Navajo Times; the Navajo Nation Resolution authorized the "transfer of all assets, liabilities, contributed capital, current fiscal year revenues and expenses and any prior years' carry-forward of excess revenues associated with the Navajo Times Program and carried on the books and records of the Navajo Nation into the Navajo Times Publishing Company, Inc. The Navajo Nation shall consider the transfer of asset values in excess of liabilities as equity investment in the Navajo Times Publishing Company, Inc. such equity investment shall be represented by a

---

[8] *See Somerlott*, 2010 WL 1541574, at *5 ("tribal commercial entities are entitled to tribal immunity regardless of where their activities take place, or the entities' degree of removal from the tasks of tribal self-governance.").

[9] *See Somerlott*, 2010 WL 1541574, at *5 (determining that tribal commercial enterprise is an "arm of the tribe" and noting that "Plaintiff offer[ed] no binding authority to support the contention that mere employment of non-Indians by a tribal commercial enterprise negatively impacts that entity's claim of tribal sovereign immunity.").

proportionate share of the initial common stock to be issued by the Company to the Navajo Nation." (Doc. 4-1, Navajo Nation Resolution, at 6 ¶2). Even if tribal officials serve as Directors of Navajo Times, the Bylaws provide that "Directors shall, in all instances, subordinate their personal interests to those of the Corporation. The Navajo Nation shall have no authority to direct the business affairs of the Corporation, except through its status as the sole shareholder of the corporation and as provided in these By-laws." (Doc. 4-2, Ex. D, Bylaws, at 18). Finally, "[a]ny officer may be removed at any time, for just cause, by action of a majority of the five members of the Board of Directors." (*Id.* at 22). Therefore, Navajo Times fails to definitively establish all of the "tribal control" factors, except factor 4: organization under Navajo law.

Finally, the court will address Navajo Times' financial relationship with the tribe under factor 10: "whether the entity generates its own revenue, whether a suit against the entity would impact the tribe's fiscal resources, and whether it may bind or obligate tribal funds." *Uniband*, 140 T.C. at 253-54 (citing *Johnson*, 2006 WL 463138, at *4). Courts disagree as to whether the "financial relationship" factor is a threshold and dispositive inquiry. *See Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 440-41 (Alaska 2004) ("The entity's financial relationship with the tribe is therefore of paramount importance—if a judgment against it will not reach the tribe's assets or if it lacks the 'power to bind or obligate the funds of the [tribe],' it is unlikely that the tribe is the real party in interest. If, on the other hand, the tribe would be legally responsible for the entity's obligations, it may be an arm of the tribe."). *Contra Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010) (we did not examine the financial relationship between [corporation] and the tribe and whether a judgment against [corporation] would reach the tribe's monetary assets, much less designate that factor as a threshold determination. Although we recognize that the financial relationship between a tribe and its economic entities is a relevant measure of the closeness of their relationship . . . that it is *not* a dispositive inquiry.").

Here, the Navajo Times was "privatized" with the capital contribution of Navajo Nation turned into equity interest. In the Navajo Nation Resolution, Navajo Nation determined that the recommendation of the EDC Resolution that "the management and staff of the Navajo Times have demonstrated that they can operate a successful business and provide a quality newspaper serving the Navajo Nation and surrounding communities, and that such corporation, if freed from the construction of a governmental program, will flourish, grow and *return dividends* to the Navajo Nation" was sound. (Doc. 4-2, Ex. A, Navajo Nation Resolution, at 5-6, ¶¶8, 9) (emphasis added). In addition, Navajo Times notes that "[t]he current unemployment rate on the Navajo Nation is 48.5 percent, and the average household income is $8,240. The Navajo Times has always been an important source of economic development and employment for Navajo Nation tribal members." (Doc. 11-1, Arviso Affidavit, at 2 ¶4). Navajo Times also asserts (without supporting documentation) that "Navajo Nation carries a retained-limit liability policy pursuant to which any judgment against the Navajo Times, up to the retained limit set in the policy ($500,000), is paid from the funds of the Navajo Nation." (*Id.* at 3 ¶17). The court is persuaded that the financial relationship between the tribe and Navajo Times, in which Navajo Nation enjoys dividends from the Navajo Times and may be financially responsible for Navajo Times' legal obligations, satisfies the 10th *Johnson* factor.

The court must now determine whether Navajo Times' shortcomings in the *Johnson* factor test warrant the determination that it is not a subordinate economic entity. Navajo Times has established that: (1) its purpose is to benefit the Navajo community by providing a quality newspaper, and that its existence fosters tribal autonomy; (2) it was created under tribal law; and (3) it possesses a financial relationship with the tribe. However, the Navajo Nation lacks the requisite control over the Navajo Times as outlined in *Johnson* factors 6, 7, 8, and 9. The court accepts the reasoning behind this lack of control: "to be wholly owned by, but independent of the political control or influence of the Navajo Nation" and "if freed from the construction of a governmental program, will flourish, grow and return dividends to the Navajo Nation." (Doc. 4-2, Ex. A, Navajo Nation Resolution, at 5-6 ¶8). The court acknowledges that "debate on public issues should be uninhibited, robust, and wide open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 450 (3d Cir. 1987).

Not all factors enumerated in the *Johnson* factor analysis must be met for the court to determine that Navajo Times is a subordinate economic entity entitled to sovereign immunity. *See, e.g., J.L. Ward Associates, Inc. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163, 1177 (D.S.D. 2012) (finding that corporation was entitled to tribal sovereign immunity—even though it was incorporated under South Dakota, rather than tribal, law and a suit against the corporation would not directly affect any particular tribe's fiscal resources—because the corporation served the general welfare of tribes, was controlled by tribes, and promoted tribal autonomy); *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010) (finding that tribe's Economic Development Authority and its Casino were subordinate economic entities because (1) tribe created authority under tribal law and its constitution; (2) the entities' purpose was for financial benefit of tribe and to enable it to engage in various governmental functions; and (3) 100% of the Casino's revenues went to Authority and then to tribe, and any reduction in Casino's revenue that could result from adverse judgment against it would therefore reduce tribe's income—even though 12 out of the 15 Casino directors were not tribal members). Accordingly, the court concludes that Navajo Times is a subordinate economic entity deserving of tribal sovereign immunity.

## CONCLUSION

For the foregoing reasons, the court finds that Navajo Times is entitled to rely on tribal sovereign immunity to defeat Trustee's Adversary Complaint. Therefore, Navajo Times' Motion to Dismiss under Rule 12(b)(1) is granted.

An appropriate judgment has been entered consistent with this decision.

The court reserves the right to revise its findings of fact and conclusions of law.

/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: April 29, 2016